1  Adam Pollock
   POLLOCK COHEN LLP
2  111 Broadway, Ste. 1804
   New York, NY 11211
3  Tel.: (212) 337-5361
   Email: adam@pollockcohen.com
4
   Roger W. Wenthe (SBN 8920)
5  ROGER WENTHE, PLLC
   2831 St. Rose Pkwy. # 200
6  Henderson, NV  89052
   Tel.: (702) 971-0541
7  Email: roger.wenthe@gmail.com

8  *Counsel for Marlena Sonn*

9           **UNITED STATES DISTRICT COURT**
             **DISTRICT OF NEVADA**
10

11  KPG INVESTMENTS INC. and
    KENDALLE GETTY,
12                                *Plaintiffs*,

13                    v.

    MARLENA SONN,
14                                *Defendant*.

15  ────────────────────────────────

16  MARLENA SONN,
                                  *Plaintiff*,
17
                      v.
18
    KENDALLE P. GETTY, as Trustee of the
    Pleiades Trust and as an individual, KPG
19  INVESTMENTS INC., as Trustee of the
    Pleiades Trust, ALEXANDRA SARAH
20  GETTY, as Trustee of the Pleiades Trust and
    as an individual, ASG INVESTMENTS INC.,
21  as Trustee of the Pleiades Trust, MINERVA
    OFFICE MANAGEMENT, INC. and
22  ROBERT L. LEBERMAN,

23                                *Defendants*.

24

**DEFENDANT
MARLENA SONN'S
RULE 12 (PARTIAL)
MOTION TO DISMISS**

Consolidated Actions

Case No. 3:22-cv-00236-ART-CLB
(Lead)
(the "KPG Complaint")


Case No. 3:22-cv-00323-ART-CLB
(Consolidated)
(the "Sonn Complaint")

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................ 17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .......................................................................... 2, 17

*Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.,*
    312 F. Supp.3d 944 (D. Nev. 2018) ...................................................... 24

*Dunham Tr. Co. v. Wells Fargo Bank, N.A.,*
    2019 U.S. Dist. LEXIS 20350 (D. Nev. Feb. 7, 2019) .................... 23, 24

*G.K. Las Vegas Ltd. P'ship v. Simon Property Group, Inc.,*
    460 F. Supp. 2d 1246 (D. Nev. 2006) .................................................. 20

*Gala v. Britt,*
    2010 U.S. Dist. LEXIS 133429 (D. Nev. Dec. 15, 2010) ..................... 22

*Ins. Co. of Pa. v. Three Square,*
    2016 U.S. Dist. LEXIS 144071 (D. Nev. Oct. 18, 2016) ..................... 23

*Las Vegas Inv'rs Grp., Inc. v. Pac. Malibu Dev. Corp.,*
    867 F. Supp. 920, 924 (D. Nev. 1994) ................................................ 22

*Leasepartners Corp. v. Robert L. Brooks Trust,*
    *Dated Nov. 12, 1975*, 113 Nev. 747 (1997) ........................................ 23

*McAteer v. Sunflower Bank, N.A.,*
    2021 U.S. Dist. LEXIS 183142 (D. Nev. Sep. 24, 2021) ................. 18, 20

*Morgan v. Bash,*
    2021 WL 601871 (D. Nev. Feb. 16, 2021) ........................................... 18

*Murray v. Provident Tr. Grp., LLC,*
    2019 U.S. Dist. LEXIS 68403 (D. Nev. Apr. 23, 2019) ....................... 22

*Nguyen v. Washington Mut. Bank, N.A.,*
    2013 U.S. Dist. LEXIS 106500 (D. Nev. July 24, 2013) ...................... 24

*Players Network, Inc. v. Comcast Corp.,*
    2015 U.S. Dist. LEXIS 12630 (D. Nev. Feb. 2, 2015) ......................... 24

*Unionamerica Mortg. & Equity Tr. v. McDonald,*
    97 Nev. 210 (1981) .............................................................................. 24

*US Bank, N.A. v. SFR Investment Pool 1,*
    2016 U.S. Dist. LEXIS 113120 (D. Nev. Aug. 24, 2016) ..................... 24

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ............................................... 18, 19, 21

**Other Authorities**

Brian Grow, Kelly Carr, *Special Report: Nevada's Big Bet on Secrecy*, Reuters (Sept. 26, 2011) 2

Iain Marlow, *South Dakota and Nevada Play Surprisingly Large Role in Pandora Papers Tax Avoidance Leak*, Fortune (Oct. 4, 2021) ................................................................. 2

J. Weston Phippen, *Nevada, a Tax Haven for Only $174*, The Atlantic (Apr. 6, 2016)................. 2

U.S. News, *What to know about Financial Advisor Fees and Costs* (Jan. 19, 2023).............. 6, 19

**Statutes and Rules**

Cal. Rev. & Tax. Code § 17742 ........................................................................................ 7

Cal. Rev. & Tax. Code § 17745(b) ................................................................................... 8

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 1

Fed. R. Civ. P. 9(b) ......................................................................................... 1, 18, 22

Restatement (Second) of Torts § 552 (1977) .............................................................. 20

**Table of Contents**

INTRODUCTION .................................................................................................. 1

I.   FACTUAL BACKGROUND ...................................................................... 2

   A.   The Getty Defendants ........................................................................ 2

   B.   Ms. Sonn's work at Christopher Street Financial ............................ 3

   C.   Ms. Sonn undertakes a more formal role in management as  Vice President of ASG and KPG Investments ...................................................................... 4

   D.   Ms. Sonn excels in her role; receives deferred compensation. ....................................... 5

   E.   Ms. Sonn was subjected to unlawful retaliation after raising concerns about avoidance of California taxes on trust income. ...................................................................... 7

II.   PROCEDURAL BACKGROUND ............................................................ 16

ARGUMENT ..................................................................................................... 17

I.   The alleged "fraud" fails to include specificity and plausibility.......................... 18

II.   Plaintiffs' negligent misrepresentation claim fails. ........................................ 20

III.   The fraudulent inducement claim lacks the requisite level of detail required by Rule 9 and is furthermore implausible. ............................................................... 21

IV.   Plaintiffs' duplicative claims should be dismissed. .......................................... 22

V.   Plaintiffs' unjust enrichment claim fails because an express written contract exists between the parties........................................................................ 23

VI.   Plaintiffs' declaratory relief claim is a remedy, and not a stand-alone claim................. 24

CONCLUSION.................................................................................................... 24

**INTRODUCTION**

Pursuant to Rule 12(b)(6), defendant (and plaintiff in the consolidated action) Marlena Sonn moves to dismiss certain claims alleged by plaintiffs (and consolidated action defendants) KPG Investments Inc. and Kendalle Getty in the "KPG Complaint" (3:22-cv-00236). As detailed below, the KPG Complaint fails to specify the level of detail necessary to support its allegations of fraud, as required by Rule 9(b); includes claims that are duplicative (and which should therefore be dismissed), implausible (because they are either contradicted or undermined by other alleged facts), or are not claims at all, but simply forms of requested relief.

This case arises from an employment relationship gone sour. As set forth in the "Sonn Complaint" (3:22-cv-00323), Marlena Sonn was punished for voicing disapproval about what she observed and understood to be an unlawful tax-evasion scheme, and for urging her employers to reverse course or undertake appropriate corrective measures. After working as a trusted financial advisor to members of the Getty family and substantially increasing the value of their trust portfolios by hundreds of millions of dollars over a period of approximately seven years, Ms. Sonn was unceremoniously terminated and subsequently denied compensation that she had already earned while working for the family—in direct retaliation for raising concerns about the legality of their questionable "tax planning" strategies.

At bottom, the parties' dispute is one based in breach of contract—one where Plaintiffs unlawfully breached their employment agreement with Ms. Sonn and wrongfully terminated her. And for the reasons stated below, this Court should reject Plaintiffs' kitchen sink claims—essentially, their counterclaims to Ms. Sonn's affirmative claims—that have been asserted against her, and grant Ms. Sonn's instant motion in its entirety.

# I.     FACTUAL BACKGROUND

## A.     The Getty Defendants[1]

Defendants <u>Kendalle P. Getty</u> ("Kendalle") and <u>Alexandra Sarah Getty</u> ("Sarah") are granddaughters of the oil tycoon, Jean Paul Getty, and heirs to his multi-billion-dollar fortune through their father, Gordon P. Getty ("Gordon"), via their interest as beneficiaries in <u>the Pleiades Trust</u>. The Pleiades Trust is one of several successor trusts to the original Getty Family Trust, a California trust that was originally established in 1934. The Pleiades Trust was established for the benefit of Gordon during his lifetime, and for the benefit of his three daughters as contingent beneficiaries upon his passing.

In or around 1995, the administration of the family trusts was transferred from California to Nevada, in order to avoid paying California state taxes on trust income.[2] To effectuate this strategy, each individual trust beneficiary was assigned a corporate trustee (*i.e.,* a Nevada-based

_____

[1] We refer to the <u>Sonn Complaint</u> Defendants in the consolidated action, No. 3:22-cv-00323-ART-CLB.  This factual background is largely drawn from Ms. Sonn's affirmative complaint. Of course, in evaluating this motion to dismiss, Ms. Sonn understands that this Court must accept as true all of the factual allegations contained in the complaint, to the extent that there is "enough factual matter" and "more than [just] labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 556 (2007).

[2] The State of Nevada does not levy income taxes on individuals or corporations (or trusts). In addition, Nevada is one of only two states in the country that does not have an information sharing agreement with federal tax authorities at the Internal Revenue Service. Consequently, Nevada has become an increasingly notorious tax haven with financial secrecy protections similar to those typically associated with offshore jurisdictions. *See, e.g.*, Brian Grow, Kelly Carr, *Special Report: Nevada's Big Bet on Secrecy*, Reuters (Sept. 26, 2011), https://www.reuters.com/article/us-shell-games-nevada/special-report-nevadas-big-bet-on-secrecy-idUSTRE78P1Y020110926; J. Weston Phippen, *Nevada, a Tax Haven for Only $174*, The Atlantic (Apr. 6, 2016), https://www.theatlantic.com/national/archive/2016/04/panama-papers-nevada/476994/; *see also* Iain Marlow, *South Dakota and Nevada Play Surprisingly Large Role in Pandora Papers Tax Avoidance Leak*, Fortune (Oct. 4, 2021), https://fortune.com/2021/10/04/south-dakota-nevada-play-large-role-in-pandora-papers-tax-avoidance-leak/.

corporation formed with such beneficiary's initials) for the purpose of residing in and serving as trustee from the State of Nevada in their stead. Defendants KPG Investments Inc. and ASG Investments Inc. are the Nevada-based corporations that serve as trustees of the Pleiades Trust for Kendalle and Alexandra Sarah, respectively—both of whom are lifelong California residents.

Defendant Minerva Office Management, Inc. is a Nevada corporation that functions as the administrative office for the Pleiades Trust and several other successor trusts to the original Getty Family Trust. Defendant Robert L. Leberman is President of Minerva and serves as Trust Administrator for the Pleiades Trust.[3]

## B. Ms. Sonn's work at Christopher Street Financial

Ms. Sonn was introduced to Kendalle in April 2013 through a mutual acquaintance in San Francisco. At the time, Kendalle and Ms. Sonn both lived in New York, and Ms. Sonn was working as a Financial Advisor at Christopher Street Financial, Inc., where she was known for her socially responsible investing. Kendalle had not been actively overseeing her personal investments at Goldman Sachs, but sought to align her portfolio with her progressive values. She joined Ms. Sonn's client roster with a relatively small portfolio and agreed to have Ms. Sonn invest her funds in a manner consistent with Kendalle's interests and values. Over the next few months, the values-aligned portfolio that Ms. Sonn created consistently outperformed market benchmarks. Kendalle eventually transferred her personal investments from Goldman Sachs to Christopher Street and recommended Ms. Sonn to her sister, Sarah.

_____

[3] Mr. Leberman is also Chief Executive Officer of the San Francisco based family office and investment fund which manages the Getty family's related assets, and serves as an officer, director, and/or agent of several other corporations formed by or for various members of the Getty family. In addition, Mr. Leberman is Chief Executive Officer of The Ann and Gordon Getty Foundation, a California nonprofit for which Kendalle and Sarah serve on the Board of Directors, along with their father.

### C.   Ms. Sonn undertakes a more formal role in management as Vice President of ASG and KPG Investments

The sisters were so pleased and impressed with Ms. Sonn's performance as their personal financial advisor that they eventually sought to employ her full-time as the principal advisor for their interests in the Pleiades Trust, which represented a much larger portion of their personal wealth than any of their investment accounts with Christopher Street.

In October 2014, Ms. Sonn left Christopher Street and assumed the role of ASG Investments' Vice President. Her responsibilities included attending all Trust meetings and voting on Sarah's behalf when necessary, consulting on investment strategies and related financial planning matters, procuring and supervising various professionals to file tax returns and maintain corporate registrations, and managing in part Sarah's personal affairs, including miscellaneous business ventures, art projects, and real estate and property management related tasks. Ms. Sonn initially received a base salary of $80,000, and an annual discretionary performance-based bonus.

Ms. Sonn soon started performing these same functions for Kendalle and KPG Investments, although she was not formally appointed (or compensated) as Vice President for KPG Investments until about a year later, on November 1, 2015. *See* KPG Compl. ¶ 9 & Ex. 1.

In addition to assuming these two roles, Ms. Sonn continued to serve as a personal financial advisor for both Kendalle and Sarah, and received a standard 1% fee on "assets under management" (AUM) for managing their personal investment accounts (which remained separate from the Pleiades Trust)—i.e., the same fee Ms. Sonn had previously charged while working at Christopher Street.

**D.      Ms. Sonn excels in her role; receives deferred compensation.**

In her capacity as Vice President of ASG Investments and KPG Investments, Ms. Sonn encouraged and empowered Kendalle and Sarah to assert their interests and opinions on matters relating to the Pleiades Trust. In early 2015, for example, Ms. Sonn retained a trust and estates attorney from the New York office of Patterson Belknap Webb & Tyler LLP (Jennifer Brown, Esq.) as outside counsel to KPG Investments, so that Kendalle would have an independent legal advisor representing her interests (instead of having to rely on the counsel of attorneys employed by her father or other family members).

Later that same year, Kendalle and Sarah directed Ms. Sonn to (a) lead the charge in removing the management of the Pleiades Trust's portfolio investments from the trust's existing investment advisor—despite substantial opposition from Mr. Leberman and others; and (b) to shift the Trust's investment strategy to align with the sisters' values (*e.g.,* divestment from fossil fuels and companies with questionable human rights records, attention to ESG (environmental, social and governance) ratings, etc.)—a strategy similar to the one Ms. Sonn applied to the sisters' personal investments. These efforts soon bore fruit. The investment strategies that Ms. Sonn devised and implemented with the Pleiades Trust portfolio significantly outperformed those of the Orpheus Trust (a trust created for Gordon Getty's sons), which had remained under the previous management.

Despite these successes, however, Ms. Sonn's total annual compensation remained small in comparison to other individuals who performed similar functions for the Pleiades Trust. As a result, Ms. Sonn asked Kendalle and Sarah in mid-2017 to reconsider her compensation structure—in part, to better reflect her growing scope of duties as Vice President of the corporate trustee entities she was managing. In fact, Ms. Sonn's compensation was well below industry standards for other similarly situated professionals performing similar work. (KPG Compl. ¶ 15.)

The sisters were receptive to the request; they recognized that Ms. Sonn's compensation did not accurately reflect the value of her contributions and realized the need to correct that in order to retain her talents as an employee.

Each sister agreed to provide Ms. Sonn with supplemental deferred compensation incentives equal to 25 basis points (.0025%) of the total aggregate after-tax value of the Pleiades Trust, to be paid out from their trust distributions upon their father's passing.[4] (*Id.* ¶¶ 17–19.) (Taken together, the incentives to be paid by both sisters amounted to 50 basis points (.0050%) on the total aggregate after-tax value of the Pleiades Trust.) In closing, this letter agreement stated the following: "KPG and I look forward to continuing our great work together. Sincerely, Kendalle P. Getty[,] Sole Director, KPG Investments Inc." KPG Compl. Ex. 2, at 2.

This incentive structure was designed to bring Ms. Sonn's compensation in line with industry standards,[5] while also accommodating the sisters' desire to defer payouts until such time as they gained access to the trust corpus. And although Ms. Sonn would have preferred to structure these incentives as paying out on an annual basis, she ultimately agreed to the proposal—based, in part, on her understanding that the triggering event (*i.e.,* Gordon's passing) was imminent, due to his advanced age and deteriorating health.

---

[4] *See* Incentive Award Letters from ASG and KPG Investments with Bonus Schedule (Nov. 10, 2017), KPG Compl. Ex. 2.

[5] Compensation for financial advisory services is typically charged as a percentage-based annual fee on total assets under management (AUM). The standard industry rate is based on 1% of AUM (*i.e.*, 100 basis points) for personal wealth management and averages around .54% of AUM (*i.e.*, 54 basis points) for institutional portfolios. *See, e.g.*, U.S. News, *What to know about Financial Advisor Fees and Costs* (Jan. 19, 2023), https://money.usnews.com/financial-advisors/articles/financial-advisor-fees-and-costs.

Over the course of the next few years, Ms. Sonn continued on the same trajectory, consistently exceeding expectations and outperforming the market, while continuously serving as a loyal advocate for Kendalle and Sarah's interests. And as a result, the value of the Pleiades Trust grew from approximately $600 million in 2013 to over $1 billion in 2021—notwithstanding generous annual income distributions to Gordon during that period. And although the sisters were not yet entitled to distributions from the trust, the growth of the portfolio owing to Ms. Sonn's successful investment strategies ultimately benefited them as the contingent remainder beneficiaries of accumulated trust income, which they would fully inherit upon their father's passing.

### E.   Ms. Sonn was subjected to unlawful retaliation after raising concerns about avoidance of California taxes on trust income.

Throughout Ms. Sonn's time working on the Pleiades Trust, Mr. Leberman and others repeatedly advised Ms. Sonn about the importance of maintaining the *appearance* that Kendalle and Sarah were neither residing, nor conducting trust business, in the State of California. This was because a major purpose of creating the Nevada corporate trust entities in 1995 was to maintain the impression that the trusts resided and were administered outside California.[6]

The viability of this estate planning strategy was, at best, questionable from the outset, because Gordon—the only non-contingent beneficiary of these trusts—is a lifelong California resident who continually maintained his principal residence in California throughout most, if not

---

[6] As is relevant here, California law provides that the taxation of trusts is governed by the residence of its beneficiaries and fiduciaries; specifically, the income of a trust is taxable in California if a "fiduciary or [non-contingent] beneficiary … is a resident, regardless of the residence of the settlor," or in the case of a corporate fiduciary like KPG Investments, "where the corporation transacts the major portion of its administration of the trust" in California. (Cal. Rev. & Tax. Code § 17742.)

1   all, of his adult life. The objective of this strategy was to defer and limit the taxation of

2   accumulated trust income until the time of distribution, at which point, under California's

3   "throwback" rule (Cal. Rev. & Tax. Code § 17745(b)), it would only become taxable if the

4   beneficiary was a resident of California at the time of distribution, and only to the extent that the

5   beneficiary was also a resident of California at the time the distributed income was accumulated.

6        The sisters' place of residence became an increasingly frequent topic of conversation in

7   2016. Kendalle had moved from New York, began travelling, and eventually returned to Los

8   Angeles in 2017. Kendalle, however, was hesitant to buy a residence there in her own name

9   because she worried that doing so would subject the Pleiades Trust to California state income

10  tax. Sarah was maintaining a residence in Japan, and expressed frustrations about having to

11  factor potential tax liabilities into decisions about how and where she spent her time. During

12  these conversations, Ms. Sonn observed that Kendalle and Sarah's discomfort around these

13  issues was less about their own desire to avoid paying California state taxes on trust income and

14  more about their hesitancy to oppose the recommendations of their father's trusted advisors on

15  the subject. It was equally clear that these issues were becoming a major source of stress and

16  anxiety, for Kendalle especially, in making decisions about where and how to live her life.

17       Based on the foregoing, Ms. Sonn was increasingly of the view that Kendalle and Sarah

18  should simply live and do business wherever they pleased, without having to participate in the

19  charade that the Pleiades Trust was being administered from Nevada—even if that meant bearing

20  the tax burden of paying California income tax on trust income. Ms. Sonn conveyed these views

21  to Kendalle and Sarah. Mr. Leberman did not appreciate Ms. Sonn's perspective, however, given

22  that his entire value proposition was minimizing the family's tax liabilities through precisely

23  these types of estate planning strategies.

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1)    *Controversy over legality of California tax avoidance strategy*

Concerns about the Pleiades Trust's fictional placement in Nevada came to a head in 2018. Nicolette (another Getty daughter and beneficiary of the Pleiades Trust) began to openly question whether the trust's administration should be moved back to California. *See* Sonn Compl. ¶¶ 69–110.[7]  In the end, however, Mr. Leberman convinced each Getty family member, except for Kendalle, that keeping the trust in Nevada would inure to their benefit.

Then, in May 2019, Nicolette sought to pursue an additional tax avoidance scheme. But Ms. Sonn only grew more skeptical. "I definitely don't want the expectation to be built up that you can live in CA and not pay the tax," she stated, in a subsequent email exchange on May 30, 2019. "Just pay it if you're staying in CA, it[']s fine. Really. Just enjoy your time there."

Then, in 2020 and into 2021, because of the COVID-19 pandemic, the family was unable to hold their trust meetings in Nevada. Instead, they took place by Webex, with all or most of the trustees and beneficiaries calling in from California. Mr. Leberman assured everyone that this was fine due to the shelter in place orders that had been issued in California and Nevada at the beginning of the pandemic. But even after these orders were withdrawn, the meetings continued via Webex, with most beneficiaries and trustees attending from California. And Ms. Sonn continued to encourage Kendalle and her sisters to simply pay the required taxes.

But, over time, Kendalle also became more comfortable with the status quo and began to discourage Ms. Sonn from raising her objections and concerns about the California tax avoidance scheme. When Ms. Sonn informed Kendalle that the shelter in place orders had been lifted and suggested they not attend meetings via Webex from California, for example, Kendalle—texting

---

[7] While too long for the page constraints herein, Ms. Sonn's complaint includes substantial detail of the parties' emails and text messages on this topic.

with Ms. Sonn from California—essentially told Ms. Sonn to let it go, because Mr. Leberman always gets his way, whether his activities are illegal or not. Thus, although the sisters were originally aligned with Ms. Sonn in voicing objections to the dubious tax avoidance scheme, it became increasingly clear that a shift had occurred by late 2019, and into 2020 and 2021, and that Ms. Sonn's dissenting views on the matter were no longer welcome.

> 2) *Wrongful retaliatory discharge from ASG Investments*

On January 27, 2021, Ms. Sonn was terminated from her role as the Vice President for ASG Investments. Ms. Sonn was surprised by this because, at the Trust meeting the day before, Sarah had just thanked her for doing such an excellent job. When asked to elaborate on her reasons, Sarah stated that the decision had nothing to do with Ms. Sonn's performance, but was a result of interpersonal conflicts and differences of opinion between Kendalle and the other trustees. Sarah indicated that she intended to do right by Ms. Sonn, by providing a severance package that would honor the spirit of the 2017 deferred compensation agreement, which was rendered void in the event of a premature termination or departure.

> From:     [Sarah]
> To:       [Ms. Sonn]
> Date:     Wednesday, January 27, 2021 at 4:49 PM
> RE:       What we discussed earlier
>
> Yesterday was a wonderful victory, and I'm grateful for your patience with Nicolette.
>
> After the meeting, dad called me, though, saying he'd like me to participate more and I agree. I have thought long and hard about this, and I've come to this conclusion.
>
> Marlena, let me preface this by stating this is by no means a reflection of your skill, conduct or performance as my VP.
>
> However, as I discussed with you on the phone, in order to avoid KPG as much as possible, be a more active player in the Trust, and to avoid any further social stresses that occur being divergent opinions you and my best friend, Nicolette have, I have decided to release you as a VP. I am willing to negotiate a severance package, but I do not believe the former agreement applies given that the amount at termination would be independent of your efforts for me after this point. I love you and would

> love to have you still be my personal financial advisor, but I would like to terminate your contract as a VP for ASG investments.
>
> Thank you for all you've done.

(emphasis added).

Consistent with their original agreement, Sarah agreed to provide a severance package that would include a payout of Ms. Sonn's deferred compensation incentive equal to 25 basis points (.0025%) of the portfolio value of the Pleiades Trust as of December 31, 2020. The only outstanding issue, according to Sarah, was whether the payment could be made in installments. Several other emails were exchanged thereafter, in which Sarah and Ms. Sonn expressed affection and good-will towards one another, and in which Ms. Sonn agreed to a two-year schedule. Sarah confirmed that the agreement and indicated that she was just awaiting a response from Mr. Leberman regarding the most optimal schedule and timing for the disbursements.

The following week however, Sarah retracted her proposal, as reflected in this series of emails accusing Ms. Sonn of misconduct in the severance negotiations. But what Ms. Sonn had asked for (and what Sarah had previously agreed to) was not unreasonable; it was consistent with the 2017 deferred compensation agreement (which had never been questioned), and was also, notably, less than market rate for comparable work.

As alleged in Ms. Sonn's complaint, Mr. Leberman—who had been openly hostile towards Ms. Sonn ever since she first voiced her opposition to the California tax avoidance scheme—was responsible for bringing about Sarah's sudden change in posture, which he did by manufacturing a laundry list of unwarranted accusations questioning Ms. Sonn's ethics for requesting just compensation.

3)      *Ms. Sonn seeks assurances from Kendalle; remains loyal and dedicated, but is ultimately discharged from KPG Investments.*

Despite being terminated by Sarah from ASG Investments in January 2021, and despite the increasing tension and hostility directed at her by Mr. Leberman and others, Ms. Sonn continued to excel in her role as Vice President of KPG Investments.

On March 1, 2021, Ms. Sonn spoke with Kendalle about wanting to confirm the deferred compensation incentives that they had originally agreed upon back in 2017, in light of these circumstances. (KPG Compl. ¶ 25.) The conversation was motivated by several factors, including the fact that the triggering event (*i.e.,* Gordon's passing) had not yet occurred—and in recognition of Ms. Sonn's continued loyalty and exceptional performance, in the midst of what had essentially become a hostile work environment. Ms. Sonn also understandably wanted some level of assurance that Kendalle would honor the deferred compensation arrangement that they had agreed upon in 2017—irrespective of when Gordon died and/or whether Ms. Sonn was still actively employed by KPG Investments when that time came. (Under the 2017 agreement, the compensation would only be paid if Ms. Sonn were still employed at the time of Gordon's passing. This meant that KPG could terminate Ms. Sonn—and the compensation—at any time. Consequently, Ms. Sonn could have potentially worked for years and then, on Gordon's death bed, Kendalle could have terminated Ms. Sonn and, under the agreement, owed nothing.)

Under the revised compensation agreement, Ms. Sonn agreed to limit her upside by taking a fixed amount instead of ultimately receiving a percentage of the trust value. (KPG Compl. ¶¶ 30–34.) Indeed, if the percentage allocated under the 2017 agreement were applied to the Trust value in 2021, the compensation would have exceeded the fixed, agreed-upon compensation under the 2021 agreement, and it would likely have grown from there. That is, the new agreement meant that Ms. Sonn would likely be paid *less* than under the existing agreement.

In return, Ms. Sonn received certainty: the earned compensation would be paid, without the risk that she could be terminated after years of work and receive no compensation.

In response to Ms. Sonn's request, Kendalle allegedly expressed to Ms. Sonn that the amount was "quite steep, and asked for time to think about the request." (KPG Compl. ¶ 44.) Through unspecified "oral conversations and written communications"—none of which include any specific dates, means of communication (e.g., email, phone call, text message, etc.), or locations—Ms. Sonn is then alleged to have asked Kendalle to "hurry and sign" the Second Incentive Award letter agreement. *Id*. ¶ 45. (The actual agreement was signed more than two weeks later.)

As with the previous negotiations over Ms. Sonn's compensation, Kendalle's principal concern was actually not about whether the *amount* was appropriate, but rather *when* the payments would be disbursed. Ms. Sonn reasoned that the payment should be made as soon as practicable, as earned compensation for her outstanding past performance and based on the value of the Pleiades Trust portfolio over that time period. Kendalle did not disagree, but wanted to defer these payments (over a period of time to manage cashflow). They settled on a middle ground, agreeing that the $2.5 million payment would be paid out in three installments of $833,333, over the course of the next three years. (KPG Compl. ¶¶ 26, 30 & Ex. 3.) Since this was merely a *deferred* payment for compensation that Ms. Sonn had already earned, the amendment included an acceleration clause that would be triggered if KPG Investments was dissolved and/or in the event of an early termination at any time prior to the final disbursement date.[8]

---

[8] Although not resolvable on a motion to dismiss, the KPG Complaint falsely alleges that Ms. Sonn discouraged Kendalle from consulting legal counsel in connection with the decision to

(continued…)

According to the new narrative in the KPG Complaint, Ms. Sonn allegedly "falsely represented" to Kendalle that the terms contained within this new letter were standard, fair, justified, and in the best interests of KPG Investments and Kendalle. (KPG Compl. ¶¶ 28, 40.) At the time, Kendalle was purportedly "experiencing extremely stressful issues in her personal life"—what exactly those issues were is unclear. (*Id*. ¶ 42.) And, Ms. Sonn purportedly represented orally that the award total would be $2 million (and not $2.5 million). (*Id*. ¶ 43.)

Notably, however, no further details are provided regarding how Ms. Sonn came to know about the unidentified "stressful issues" in Kendalle's personal life (e.g., the time, date, place, or means by which such information was purportedly shared). *See* KPG Compl., generally. Similarly, any further details concerning Ms. Sonn's purported misrepresentation of the total award amount—i.e., the time, date, location, or means by which such information was shared (e.g., by video call, phone, in-person, etc.)—are absent. *See id*.

On March 17, 2021, Kendalle signed the Second Incentive Award Letter, *see id*. ¶ 51, in her capacity as "Sole Director, KPG Investments Inc.," and noted in closing the following: "I look forward to continuing our great work together." (KPG Compl., Ex. 3, at 2.) The first $833,333 installment was paid on March 31, 2021, without any problems, concerns, or indications of ill-will from Kendalle, but the remaining installments were never paid.

_____

execute the revised agreement. This allegation is simply false. To the contrary, Ms. Sonn had originally talked with Kendalle about a revised agreement around March 1, 2021, and encouraged her to review the letter, once drafted, with counsel at the Patterson Belknap law firm. They continued to talk in mid-March (anyway, they spoke and texted very regularly); and the agreement was eventually signed on March 17, 2021. Certainly, there was plenty of opportunity to consult counsel.

### 4) *Ms. Sonn was unlawfully terminated in retaliation*

Following this payment—i.e., at some unidentified date, time, or location—some "various interested individuals associated with Plaintiff Getty"—none of whom are identified— "learned of the Second Incentive Award Letter's terms" and informed Kendalle that "the terms were, in fact, [allegedly] unusual." (KPG Compl. ¶ 56.) No additional facts are provided, however, to explain why such terms were purportedly "unusual"—only conclusions.[9]

Nonetheless, Kendalle then allegedly formed the belief that she had been taken advantage of. (*Id.* ¶ 57.) And on November 30, 2021, plaintiffs KPG Investments and Kendalle notified Ms. Sonn that they were terminating her employment. (*Id.* ¶ 58.) The letter alleged, in sum and substance, that Ms. Sonn had breached her fiduciary duties by asking Kendalle to revisit and confirm the terms of the deferred compensation agreement, and it made vague references to various unspecified misrepresentations and/or acts of supposed coercion.

\*        \*        \*

---

[9] As detailed in the Sonn Complaint (¶¶ 122–26), on September 18, 2021, the previous Treasurer and Secretary of KPG Investments, Francis Nash, passed away after a long battle with cancer. Mr. Leberman then confronted Kendalle about the payment to Ms. Sonn and used this event as a justification for getting rid of Ms. Sonn once and for all. Simply put, Kendalle was essentially strong-armed into going along with Mr. Leberman's plan. She did so, in part, because she was worried that he might attempt to have her placed under a conservatorship if she didn't, by portraying her well-considered decision to confirm Ms. Sonn's compensation incentives as evidence that she was supposedly not of sound mind.

In a follow up call between Ms. Sonn, Kendalle, and Ms. Brown, Kendalle conveyed her concerns about not wanting to give Mr. Leberman any reason to have her placed under a conservatorship and noted that Ms. Brown had also characterized the payment as being "unusual." When Ms. Sonn asked Ms. Brown whether she agreed with this characterization, she said something to the effect that "yes, but your role is also unusual," and "no one is saying that you shouldn't be compensated accordingly." The call ended with Kendalle saying that she wanted to revisit the revised compensation incentive agreement but would consider a commensurate increase in Ms. Sonn's salary. Kendalle also said she wanted Ms. Sonn to have health care and retirement benefits.

Over the course of her employment with the Getty Defendants, Ms. Sonn was personally responsible for overseeing the growth of the Pleiades Trust from approximately $600 million to well over $1 billion, nearly *doubling* its value, notwithstanding generous annual payouts of accumulated trust income. Meanwhile, the Getty Defendants have refused to honor their original agreements to compensate Ms. Sonn based on the value that she delivered to the trust. They have defaulted on their commitment to substitute those agreements with confirmatory agreements, *even after* Ms. Sonn agreed to accept a smaller, fixed amount from each sister.

## II.     PROCEDURAL BACKGROUND

From these events, the parties have since brought various suits. On March 17, 2022, KPG Investments, Inc. and Kendalle Getty filed suit against Ms. Marlena Sonn, and alleged claims for (a) breach of the fiduciary duty; (b) fraudulent / intentional misrepresentation; (c) negligent misrepresentation, (d) fraudulent inducement, unconscionability, and undue influence; (e) contractual breach of the implied covenant of good faith and fair dealing; (f) tortious breach of the implied covenant of good faith and fair dealing; (g) unjust enrichment, in the alternative; and (h) declaratory judgment. *See* KPG Compl. ¶¶ 59–126 (ECF No. 1-2); *see also* July 27, 2022 Order (ECF No. 16) (complaint had originally been filed in Washoe County District Court and later removed to this Court on May 26, 2022, as Case No. 3:22-cv-00236).

On May 11, 2022, Ms. Sonn filed an action against KPG Investments, Kendalle, and others, alleging claims for (a) unlawful retaliation, in violation of California Labor Code sec. 1102.5; (b) breach of contract, as against ASG Investments, Inc.; (c) quantum meruit, as against Alexandra Sarah Getty and ASG Investments, Inc.; (d) breach of contract, as against plaintiff KPG Investments, Inc.; (e) quantum meruit, as against Kendalle and KPG Investments; (f) unjust enrichment; and (g) tortious interference, willful misfeasance and bad faith. *See Sonn v. Kendalle Getty et al*., No. 1:22-cv-02758 (E.D. N.Y.), Compl. (ECF No. 1).

The parties then agreed to transfer that action to this judicial district, *see* 3:22-cv-00323-LRH-CLB, and this Court consolidated these two actions under the case number of the first-filed case, *KPG Investments, Inc., et al, v. Marlena Sonn*, No. 3:22-cv-00236-ART-CLB.  *See* July 27, 2022 Order (ECF No. 16). This Court further directed the parties to participate in a settlement conference. *See id*.

On January 18, 2023, Magistrate Judge Robert A. McQuaid Jr. held a settlement conference with the parties. *See* Minutes of Proceedings (ECF No. 38). The parties, however, were unable to resolve their differences. As a result, defendant (and consolidated action plaintiff) Marlena Sonn now brings this Rule 12(b)(6) motion to dismiss.

**ARGUMENT**

As noted above, this dispute revolves around a breach of an employment agreement. Plaintiffs KPG Investments and Kendalle have applied a kitchen sink approach to gin up a number of claims that on their face, fail to state a claim under Rules 9 and 12. Accordingly, this Court should grant Ms. Sonn's motion to dismiss in its entirety.

Where a plaintiff's complaint fails to state a claim upon which relief can be granted, dismissal is appropriate under Rule 12(b)(6). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, <u>legal conclusions couched as factual allegations are insufficient</u>. *See Twombly*, 550 U.S. at 555 (emphasis added). In other words, Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the factual content pled "allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Under this standard "more than a sheer possibility [must exist] that a defendant has acted unlawfully." *Id.*

Plaintiffs' claims are furthermore subject to Rule 9(b)'s heightened pleading standard because they sound in fraud. *See*, *e.g.*, Compl. at ¶¶ 71–79. Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." *See McAteer v. Sunflower Bank, N.A.*, 2021 U.S. Dist. LEXIS 183142, at *5–6 (D. Nev. Sep. 24, 2021). A plaintiff must provide the "who, what, when, where, and how" of the fraudulent actions. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotation omitted). This requires "more than the neutral facts necessary to identify the transaction," including "what is false or misleading about a statement, and why it is false." *Id.* (quotation omitted).

This Court should dismiss Kendalle and KPG Investment's claims for several reasons.

## I.   The alleged "fraud" fails to include specificity and plausibility.

First, Plaintiffs' complaint fails to include the necessary details to state a claim for fraud (**Second Cause of Action**).[10] *See* Fed. R. Civ. P. 9(b). Plaintiffs' basic assertion is that Ms. Sonn (a) proposed terms in the Second Incentive Award Letter agreement that were purportedly "unusual," not "standard," or else not in the best interests of KPG Investments and Kendalle Getty, which the KPG Complaint characterizes as "false representations"; and (b) orally misrepresented the total amount of the incentive award as being $2 million, when the 2-page letter stated that it would be $2.5 million. (KPG Compl. ¶¶ 28, 40–44, 56, 72–74.)

---

[10] The causes of action in the KPG Complaint under the 2021 compensation agreement are purportedly governed by the agreement's narrow Nevada choice of law provision. However, Ms. Sonn's retaliation claims (in the Sonn Complaint) arise independently and should be construed under California or New York law. *See Morgan v. Bash*, 2021 WL 601871, at *2 (D. Nev. Feb. 16, 2021).

But none of these assertions explain why Ms. Sonn's proposed terms to the Second letter agreement were "unusual," not standard, or otherwise unfair. The persons purportedly identifying the terms as "unusual" are not identified. No date, time, location, or means of communication is identified. Likewise, no facts are included explaining why Ms. Sonn's proposed terms were "false" (i.e., not otherwise standard, fair, or in the best interests of the Plaintiffs). In short, the "who, what, when, where, and how" of the purportedly fraudulent actions, are missing. *Vess*, 317 F.3d at 1106 (a plaintiff, consistent with Rule 9, must identify "what is false or misleading about a statement, and why it is false.").[11]

*Second*, if there had been something wrongful about the *amount* of compensation under the revised agreement, something would have been said in the previous four years. But nothing adverse was said. Indeed, the compensation in the 2021 agreement was in line with industry standards and was, likely, *less* than would have been received under the 2017 agreement.

Similarly, to the extent Ms. Sonn allegedly orally "misrepresented" the amount of the total payment, it was unreasonable for Plaintiffs to rely on such a statement. As noted above, Kendalle could have read the first page of the two-page Second Incentive Award Letter agreement to see what the proposed total amount would be. Kendalle could have also (if she did not do so already) reach out to her own legal counsel. In other words, it is implausible to believe that Kendalle would feel pressured to either disregard reading the two-page agreement or else

---

[11] Even accepting Plaintiffs' purported facts, the payment of $2.5 million for managing and providing financial advice for the Pleiades Trust—valued at over $1 billion—was fair. Under an "assets under management" fee structure, a financial advisor fee of 1% for an investment portfolio of $1 million is common. *See, e.g.*, U.S. News, *What to know about Financial Advisor Fees and Costs* (Jan. 19, 2023), https://money.usnews.com/financial-advisors/articles/financial-advisor-fees-and-costs. And for very large accounts, that percentage may decrease "to as low as 0.25%". *Id*. Here, applying such a model to Ms. Sonn, results in an even lower percentage fee of 0.24% (i.e., $2.5 million incentive award / $1.035 billion in Pleiades Trust assets = 0.24%).

forget to contact her own personal counsel, because of some unidentified "stressful issues in her personal life" that Ms. Sonn had no part in creating.

The KPG Complaint portrays the revised 2021 compensation agreement as somehow inherently wrongful, in that it provides for compensation even if Ms. Sonn were terminated. This agreement, however, properly achieved certainty for Ms. Sonn for her *already* performed and earned employment. And, as noted above, it avoided the uncertainty under the 2017 agreement that she could have been discarded at any time and ultimately not receive this compensation.

In short, Plaintiffs' fraud claim fails to state a claim, much less include the level of detail required under Rule 9. Accordingly, dismissal is appropriate here.

## II.     Plaintiffs' negligent misrepresentation claim fails.

For similar reasons, Plaintiffs' negligent misrepresentation claim (**Third Cause of Action**) also fails. Under Nevada law, a claim for negligent misrepresentation requires a plaintiff to plead (1) the defendant made a false representation; (2) the defendant made the representation during its course of business or in an action in which it had a pecuniary interest; (3) the defendant made the representation for the guidance of others in their business transactions; (4) the plaintiff justifiably relied on the representation; (5) the reliance resulted in pecuniary loss to the plaintiff; and (6) the defendant did not exercise reasonable care or competence in obtaining or communicating the information. *G.K. Las Vegas Ltd. P'ship v. Simon Property Group, Inc.*, 460 F. Supp. 2d 1246, 1262 (D. Nev. 2006); *see also* Restatement (Second) of Torts § 552 (1977); *McAteer v. Sunflower Bank, N.A.*, 2021 U.S. Dist. LEXIS 183142, at *13–14 (D. Nev. Sep. 24, 2021).

Here, as noted above, Plaintiffs' complaint fails to identify facts sufficient to support a "false" representation, as required by Rule 9. The persons purportedly identifying the terms as "unusual" are not identified. No date, time, location, or means of communication is identified.

Likewise, no facts are included explaining why Ms. Sonn's proposed terms were "false" (i.e., not otherwise standard or fair). *See id.* In short, the "who, what, when, where, and how" of the purportedly fraudulent actions, are missing. *Vess*, 317 F.3d at 1106 (a plaintiff, consistent with Rule 9, must identify "what is false or misleading about a statement, and why it is false."). The alleged "fail[ure] to exercise reasonable care of competence in obtaining or communicating … information to guide Plaintiffs in connection with business transactions" is devoid of facts and only contains conclusions. And it is implausible to believe that plaintiffs KPG Investments and Kendalle would otherwise ignore the plain language of the Second Incentive Award Letter or would not seek their own counsel. In short, Plaintiffs' negligent misrepresentation claim (Third Cause of Action) fails as a matter of law.

### III.   The fraudulent inducement claim lacks the requisite level of detail required by Rule 9 and is furthermore implausible.

Plaintiffs' fraudulent inducement and unconscionability claim (**Fourth Cause of Action**) also fails as a matter of law. Simply put, Plaintiffs fail to identify sufficient facts surrounding the purportedly "stressful issues in her personal life" (KPG Compl. ¶ 42), much less any detailed facts surrounding the alleged fraud Ms. Sonn purportedly engaged in to induce Kendalle into signing the Second Incentive Award Letter agreement. At most, Plaintiffs allege that through unspecified "oral conversations and written communications"—none of which include any specific dates, means of communication (e.g., email, phone call, text message, etc.), or locations—Ms. Sonn is then alleged to have asked Kendalle to "hurry and sign" the Second Incentive Award letter agreement. (*Id.* ¶ 45.) The absence of such factual details underscores that Plaintiffs' claims are unfounded and should be dismissed.

Plaintiffs' claims of substantive and procedural unconscionability similarly lack any supporting facts. (*Id.* ¶¶ 94–96, suggesting that Plaintiffs lacked a meaningful opportunity to

consider the Second Incentive Award Letter's terms, and that the proposed compensation award

was so "one-sided and oppressive as to constitute substantive unconscionability"). Again,

nothing in Plaintiffs' complaint explains why such terms might be unconscionable. (To the

contrary, and as explained earlier, such terms seem to be an appropriate, fair recognition of Ms.

Sonn's "great work" on behalf of Plaintiffs.)

Accordingly, this Court should reject Plaintiffs' fraudulent inducement and

unconscionability claim for Plaintiffs' failure to include the requisite particularity (e.g., time,

place, means of communication, etc.) and why such agreed-to terms were so unfair. *See*, *e.g.*,

*Gala v. Britt*, 2010 U.S. Dist. LEXIS 133429, at *12–13 (D. Nev. Dec. 15, 2010) (granting

defendants' motion to dismiss with prejudice as to plaintiffs' fraudulent inducement claim for

failure to meet the requirements of Rule 9(b)).

**IV.    Plaintiffs' duplicative claims should be dismissed.**

Plaintiffs' claim for breach of fiduciary duty (**First Cause of Action**) is furthermore

duplicative of Plaintiffs' claim for alleged breach of the implied covenant of good faith and fair

dealing (Fifth Cause of Action).

Here, Plaintiffs' alleged misconduct under both claims is virtually identical. As a result,

this Court should dismiss Plaintiffs' claim for breach of fiduciary duty (First Cause of Action).

*See Lake at Las Vegas Inv'rs Grp., Inc. v. Pac. Malibu Dev. Corp.*, 867 F. Supp. 920, 924 (D.

Nev. 1994) (finding that a breach of fiduciary duty claim is redundant of a breach of contract

claim, and dismissing such breach of fiduciary duty claim under Rule 12), *aff'd*, 78 F.3d 593 (9th

Cir. 1996); *see also Murray v. Provident Tr. Grp., LLC*, 2019 U.S. Dist. LEXIS 68403, at *16

(D. Nev. Apr. 23, 2019). Plaintiff's alleged claim for tortious breach of the implied covenant of

good faith and fair dealing (**Sixth Cause of Action**, *see* KPG Compl. ¶ 111) is furthermore

duplicative of Plaintiffs' alleged claims for fraud, fraudulent inducement, and unjust enrichment

(Second, Fourth, and Seventh Causes of Action). Accordingly, such claim should also be dismissed.

**V.      Plaintiffs' unjust enrichment claim fails because an express written contract exists between the parties.**

Plaintiffs' unjust enrichment claim (**Seventh Cause of Action**) should also be dismissed. "An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *Ins. Co. of Pa. v. Three Square*, 2016 U.S. Dist. LEXIS 144071, at \*5–6 (D. Nev. Oct. 18, 2016) (citing *Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 113 Nev. 747, 755 (1997)). As explained by Nevada's highest court in *Leasepartners*, "[t]he doctrine of unjust enrichment or quasi contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another [or should pay for]." *Id.* at 756.

But because an express, legal contract exists here—i.e., 2021 compensation agreement (and the Employment Agreement and the First Incentive Award Letter agreement) (*see* KPG Compl. Exs. 1–3)—a claim for unjust enrichment must be dismissed. *See*, *e.g.*, *Ins. Co. of Pa.*, 2016 U.S. Dist. LEXIS 144071, at \*5–6 (dismissing unjust enrichment claim where an express, legal contract **e**xists); *Dunham Tr. Co. v. Wells Fargo Bank, N.A.*, 2019 U.S. Dist. LEXIS 20350, at \*19–20 (D. Nev. Feb. 7, 2019) ("It is well established that there cannot be a claim for unjust enrichment where a contract governs the parties' relationship to each other.").[12] In short, Plaintiffs' unjust enrichment claim fails.

---

[12] Even assuming *arguendo* that no contract exists (which is plainly not the case here, *see* KPG Compl. Exs. 1–3)), plaintiffs' complaint fails to state a claim for unjust enrichment—the elements of which are as follows: (1) a benefit conferred on the defendant by the plaintiff; (2)

(continued…)

**VI.    Plaintiffs' declaratory relief claim is a remedy, and not a stand-alone claim.**

Finally, this Court should also dismiss Plaintiffs' "Eighth Cause of Action" for declaratory relief. *See* KPG Compl. ¶¶ 119–26. This is because declaratory relief "is merely a remedy, not a stand-alone cause of action." *Players Network, Inc. v. Comcast Corp*., 2015 U.S. Dist. LEXIS 12630, at \*22 (D. Nev. Feb. 2, 2015); *see also Nguyen v. Washington Mut. Bank, N.A*., 2013 U.S. Dist. LEXIS 106500, at \*5 (D. Nev. July 24, 2013) (declaratory relief "is merely a remedy available for established causes of action, and is not itself a separate cause of action").

Accordingly, this Court should dismiss Plaintiffs' Eighth Cause of Action.

## CONCLUSION

For all the foregoing reasons, Ms. Sonn asks this Court to grant her motion to dismiss the **First, Second, Third, Fourth, Sixth, Seventh, and Eighth** causes of action.[13]

Dated:    February 8, 2023              Respectfully submitted,
              New York, NY
                                        POLLOCK COHEN LLP

                                        By:    /s/ Adam Pollock

---

appreciation by the defendant of such a benefit; and (3) acceptance and retention by the defendant of such a benefit. *See Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 312 F. Supp.3d 944, 956 (D. Nev. 2018) (citing *Unionamerica Mortg. & Equity Tr. v. McDonald*, 97 Nev. 210 (1981)).

This is because an unjust enrichment claim only lies against a defendant "who has willingly received the plaintiff's labor or goods without giving anything of equal value in return." *US Bank, N.A. v. SFR Investment Pool 1*, 2016 U.S. Dist. LEXIS 113120, at \*40 (D. Nev. Aug. 24, 2016). Here, because Plaintiffs do not allege that Ms. Sonn failed to give anything of equal value—e.g., through her management of investment decisions, financial advice, etc.—Plaintiffs' claim here also fails on these grounds. *See, e.g.*, *Dunham Tr. Co.*, 2019 U.S. Dist. LEXIS 20350, at \*19–20 (dismissing an unjust enrichment claim where it was unclear whether no benefit had been exchanged by the defendant in return).

[13] Ms. Sonn strongly contests all factual allegations made in the KPG Complaint, including those alleged in support of the Fifth cause of action.  However, while this cause of action may not be resolvable at the motion to dismiss stage, Ms. Sonn will deny it in her forthcoming Answer (after the decision on the partial motion to dismiss), and expects that it will be dismissed at the Summary Judgment stage.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Adam Pollock (admitted *pro hac vice*)
111 Broadway, 18th Floor
New York, NY 10006
Tel.: 212-337-5361
Email: apollock@pollockcohen.com

Roger W. Wenthe (SBN 8920)
Roger Wenthe, PLLC
2831 St. Rose Pkwy. # 200
Henderson, NV  89052
Tel.: 702-971-0541
Email: roger.wenthe@gmail.com

Counsel for Marlena Sonn